Teresa CLEMENTS, Plaintiff,

v.

Robert D. ROGERS, Gordon E. Forward, Robert Alpert, Gerald R. Heffernan, John M. Belk, Eugenio Clariond Reyes, Chaparral Steel Company, and Texas Industries, Inc., Defendants.

Civil Action No. 15711.

Court of Chancery of Delaware, Castle County.

Submitted: May 18, 2001.
Decided: Aug. 14, 2001.
Revised: Nov. 8, 2001.

---

Norman M. Monhait, Esquire, of Rosenthal, Monhait, Gross & Goddess, Wilmington, Delaware; Of Counsel: Peter G.A. Safirstein and Robert M. Kornreich, Esquires, of Wolf Popper, New York, New York, Attorneys for Plaintiff.

William O. LaMotte, III and Jessica Zeldin, Esquires, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, Attorneys for Robert D. Rogers, Gordon E. Forward, Robert Alpert, Gerard R. Heffernan, Chaparral Steel Company and Texas Industries, Inc.; Robert K. Payson and Arthur L. Dent, Esquires, of Potter, Anderson & Corroon, Wilmington, Delaware; Of Counsel: Michael R. Smith and John P. Brumbaugh, Esquires, of King & Spalding, Atlanta, Georgia, Attorneys for John M. Belk and Eugenio Clariond Reyes.

## MEMORANDUM OPINION

STRINE, Vice Chancellor.

Texas Industries Inc. ("TXI") purchased the 16% of Chaparral Steel Company it did not already own in a December 31, 1997 merger. The merger price of $15.50 per share was negotiated between TXI and a "Special Committee" comprised of the only two members of the Chaparral board not affiliated with TXI. The merger's approval was guaranteed by TXI's votes and was not made contingent on a majority of the minority vote.

Even before the merger terms were finally negotiated, this action was brought challenging the fairness of the merger, and naming the directors of Chaparral and TXI as defendants. The defendants have moved for summary judgment dismissing plaintiff's complaint. The major argument raised by the defendants is that the plaintiff is barred from pressing her claims by the doctrine of acquiescence. The defendants premise their acquiescence argument on two distinct bases. The first is that the plaintiff acquiesced in the merger by accepting the merger consideration at a time when she already had concluded that the merger was unfair, and already had received substantial document discovery.

I reject this argument because it conflicts with this court's decisions in *Iseman v. Liquid Air Corp.*,[1] and *Siegman v. Columbia Pictures Entertainment, Inc.*,[2] which indicate that a plaintiff is not barred by the doctrine of acquiescence unless she knew all, and not merely some, of the material facts regarding the merger at the time she accepted the merger consideration.

Alternatively, the defendants argue that the merger "Proxy Statement" disclosed all material facts relevant to plaintiff's decision, and that she is therefore barred under the teaching of *Bershad v. Curtiss–Wright Corp.*[3] I conclude, however, that there are material disputes of fact regarding whether the Proxy Statement fairly disclosed all material facts bearing on the fairness of the merger. In particular, the record reveals litigable issues regarding the effectiveness of the Chaparral Special Committee, issues that potentially undercut the accuracy of the Proxy Statement's description of the merger negotiation and approval process. As to several of the plaintiff's disclosure claims, however, I conclude that the defendants are entitled to summary judgment. In addition, I find that the plaintiff's claims against the Special Committee members implicate only their duty of care, and are barred by Chaparral's exculpatory charter provision. Because the claims against the directors affiliated with TXI implicate their duty of loyalty, I deny their request to be dismissed in reliance on that same provision.

## I. The Parties

### A. The Plaintiff

Plaintiff, Theresa S. Clements, is a former stockholder of Chaparral. Before she accepted the merger consideration, Clements owned 106 shares of Chaparral.

### B. The Defendants

Chaparral is a Delaware corporation with its principal place of business in Midlothian, Texas. Chaparral produces steel products, including reinforced bars and beams, for use by construction firms, manufacturers, and other industrial consumers.

TXI is a Delaware corporation, which produces steel, cement, aggregate and concrete products, and is also headquartered in Texas. Before an initial public offering of Chaparral stock in 1988, TXI owned all of Chaparral's equity. As of the merger, TXI owned around 84% of Chaparral's stock.

The following defendants were members of the Chaparral board who were also affiliated with TXI as of the merger date: Robert D. Rogers, chairman and director of the Chaparral board, as well as president, chief executive officer ("CEO"), director, and a major stockholder of TXI; Gordon E. Forward, president, CEO, and director of Chaparral, as well as director of TXI; Robert Alpert, director of both Chaparral and TXI; and Gerald R. Heffernan, director of both Chaparral and TXI.

The remaining defendants were the two independent directors sitting on the Chaparral board as of the time of the merger. Defendant John M. Belk first joined the Chaparral board in 1987 and served as chairman of the Special Committee that negotiated and blessed the merger. Belk is an experienced businessman, who spent his career successfully running a large

---

1. Del. Ch., C.A. No. 9694, 1993 WL 40048, Berger, V.C. (Feb. 11, 1993).

2. Del. Ch., C.A. No. 11152, 1993 WL 10969, Hartnett, V.C. (Jan. 15, 1993).

3. Del.Supr., 535 A.2d 840, 842 (1987).

chain of department stores owned by his family, and has served on other public company boards.

Defendant Eugenio Clariond Reyes ("Clariond") joined the Chaparral board in 1993 and served on the Special Committee along with Belk. Clariond is CEO of Grupo IMSA, a large Mexican corporation with significant involvement in the steel industry.

After the merger, TXI asked both Belk and Clariond to join the TXI board. Both accepted the offer.

### C. *The Basic Factual Background*

The parties have briefed a panoply of disclosure issues, which I will address individually later in the opinion. The basic factual chronology follows.

In April 1997, the TXI board authorized the company's management to evaluate a purchase of the publicly held shares of Chaparral. Over the next month, TXI management, led by the company's chief financial officer ("CFO") Richard M. Fowler, analyzed whether such a purchase would be beneficial to TXI. Fowler was ideally suited to lead such an inquiry, because he was also CFO of Chaparral. To aid management in this task, TXI engaged its investment banker of long-standing, SBC Warburg Dillon Read, Inc. ("Dillon Read"), to perform financial analyses and to assist with any negotiations that might follow a TXI offer.

TXI's interest in acquiring the rest of Chaparral's shares coincided with Chaparral's consideration of a major strategic investment. That investment involved the construction of a new steel mill that would provide Chaparral with the capacity to manufacture steel beams up to 36 inches in depth, a 33% increase over Chaparral's existing maximum. Chaparral wished to locate the new mill in the Southeastern United States, thus giving the company a presence on the eastern seaboard, where steel demand was high.

To aid the board in deciding whether to construct the "Chaparral East" mill, Fowler constructed a number of five-year financial models, based on different assumptions about raw material prices, production rates, and product prices. These hypothetical "Management Scenarios" produced a wide range of prospective results. One of the Scenarios, Case One, was considered by Chaparral management to be the most likely, and estimated that Chaparral's net income would be $62 million in 1998 and increase to $134 million in 2003. The Management Scenarios were generated solely in connection with the Chaparral East investment decision, and were not the result of a regular process of financial forecasting for Chaparral. To the contrary, Chaparral as a rule did not forecast its earnings over periods beyond a year.

Dillon Read factored the development of Chaparral East into its work during April and May of 1997. Among the analyses Dillon Read conducted was an April 2, 1997 preliminary discounted cash flow ("DCF") valuation based on "low," "base," and "growth" cases. The mid-range values of each analysis are as follows: $12.37 and $12.82 per Chaparral share for the low case;[4] $14.49 and $15.00 per Chaparral share for the base case;[5] and $16.90 and $17.50 per Chaparral share for the growth case.[6]

Likewise, Dillon Read generated a later May 15, 1997 DCF valuation, using the assumptions from four of the Management Scenarios. This analysis generated a

---

4. PX 20.

5. PX 21.

6. PX 22.

range running from $4.66 a share to $24.22 a share. The part of the analysis based on Case One implied a per share value of $20.06.

TXI management and Dillon Read met in preparation for the TXI board meeting at which a purchase of the Chaparral public shares would be considered. At a meeting, the participants discussed having TXI offer $14.25 a share as an opening bid, and the anticipation that the deal would eventually get done between $15 and $16.[7] The participants also discussed the DCF values generated by Dillon Read. According to the defendants, neither TXI management nor Dillon Read had confidence in these preliminary valuations, and regarded them as highly unreliable. Fowler's contemporaneous notes of the meeting are consistent with the inference that neither TXI management nor Dillon Read regarded the Management Scenarios as forming the basis for a realistic DCF analysis.[8] The plaintiff argues (without plausible support from the record) that this contention is a pretext, however, designed to discredit valuations that produced per share values that supported a valuation of over $16 per Chaparral share.

What is undisputed is that TXI management and Dillon Read decided to put together a board book that did not include a DCF valuation. At the same time, they agreed that the negotiators for Chaparral would undoubtedly seek to use DCF valuations to argue for a higher price and that TXI would have to be in a position to push back.

On May 22, 1997, the TXI board met to decide whether to make an offer for the Chaparral public shares. Dillon Read presented the board with information bearing on the value of Chaparral, whether an acquisition of the public shares would be accretive to TXI earnings, and the process that would likely ensue if TXI made an offer. The Dillon Read presentation omitted the DCF valuations.

After hearing from Dillon Read and management, the TXI board voted to proceed with an offer, at the $14.25 previously discussed by Dillon Read and TXI. This price was not based on any determination that $14.25 was a "fair" value for Chaparral shares, but instead was an opening move to get the deal negotiation process going. The deal represented a 10.68% premium to Chaparral's pre-announcement trading price of $12.875.

Immediately following the TXI board meeting, a special meeting of the Chaparral board of directors was called. Independent directors Belk and Clariond were hooked in by phone. The TXI offer was discussed, and a resolution was proposed to form a Special Committee comprised of Belk and Clariond to consider the fairness of the TXI offer and to negotiate its terms with TXI. Belk was made Chairman, in accordance with prior discussions he had with TXI management. The Special Committee was authorized to hire its own advisors.

For its legal advisor, the Special Committee selected the King & Spalding firm, whose expertise and effectiveness is not challenged on this motion. The Special Committee's selected financial advisor, Robinson–Humphrey, comes in for different scrutiny.

Robinson–Humphrey was selected over two larger competitors, Paine Webber and Salomon Brothers. Although Robinson–Humphrey undoubtedly was competent to perform the engagement, it is at the very least doubtful that it was better

---

7. PX 46.

8. See *id.*

situated than Salomon Brothers to do the engagement. While Robinson–Humphrey's team included a respected analyst who followed the steel industry, the firm had never advised a steel company in a mergers and acquisitions ("M & A") transaction. The record regarding the selection of Robinson–Humphrey is complicated by Clariond's inability to recall Salomon's proposal, despite the fact that the Proxy Statement says that the Special Committee reviewed three proposals.

According to the Proxy Statement, the "Special Committee selected Robinson–Humphrey as financial advisor to the Special Committee because it is a nationally recognized investment banking firm that has substantial experience in transactions similar to the Merger."[9] This statement is literally true, but perhaps omits the most obvious reasons why Robinson–Humphrey was hired: it was a smaller firm that specialized in companies with the market cap of Chaparral's and could be expected to give more attention at a more reasonable price to the transaction than would bigger players like Salomon or Paine Webber.[10] In any event, there is no basis in the record to infer that Belk or Clariond retained Robinson–Humphrey for any improper purpose.

On June 6, 1997, the Special Committee formalized its retention of Robinson–Humphrey. The engagement letter states in pertinent part that:

As compensation for the services rendered by Robinson–Humphrey hereunder, the Company shall pay Robinson–Humphrey as follows:

(a) a retainer of $50,000, payable upon the signing of this Agreement; and

(b) an additional fee of $200,000, payable upon the delivery of the Opinion by Robinson–Humphrey [defined as an "opinion … with respect to the fairness, from a financial point of view, to the Company's stockholders other than [TXI] of the consideration to be received in the Proposed Acquisition by such stockholders"][11]

The engagement letter obligated Robinson–Humphrey to update any fairness opinion, for no additional charge, for inclusion in any proxy statement issued in connection with the transaction. Robinson–Humphrey's deal team was led by MacLaine Kenan, who was then a senior vice president of the firm. Kenan was assisted by two relatively junior employees.

In June 1997, Robinson–Humphrey began its work in earnest. It conducted due diligence at Chaparral, in order to form a basis for providing financial advice to the Committee regarding TXI's offer. In the course of due diligence, Robinson–Humphrey was provided with the Management Scenarios and informed that Case One was the Scenario deemed most likely by Chaparral management. Robinson–Humphrey also learned that Chaparral's results for the quarter ending June 30, 1997 were likely to exceed analyst expectations by perhaps as much as ten cents per share. And in reaction to TXI's bid, the market price for Chaparral stock had increased to $15.25 per share. Given these and other factors, Robinson–Humphrey came to the

9. DX 5, at 25.

10. The pitch that Robinson–Humphrey made to the Special Committee is consistent with this inference.

11. Baxley Aff. Ex. A.

view that TXI's initial bid should not be accepted.

On June 20, 1997, the Special Committee met to consider TXI's bid. Robinson–Humphrey presented the board with a book containing various analyses of Chaparral's value. According to defendants, the "June 20 Presentation" contained preliminary analyses that were purposely designed to be very aggressive, so that Robinson–Humphrey could use them during negotiations with TXI to justify a higher price. The defendants argue that the June 20 Presentation was not intended as a reliable basis from which to make a final, fairness determination. Rather, the June 20 Presentation was designed to give the Special Committee what it needed to reject the $14.25 offer and leverage to exact a higher price from TXI.

By contrast, the plaintiff contends that there was nothing "preliminary" about the June 20 Presentation. Rather, the June 20 Presentation was designed to provide a reliable basis for assessing the fairness of the $14.25 offer, reflected Robinson–Humphrey's due diligence work, and incorporated input from Chaparral management. In support of this argument, the plaintiff notes that the testimony of the Special Committee members is devoid of any clear understanding that the June 20 Presentation was simply designed as "negotiating materials." Likewise, the plaintiff notes that the Proxy Statement does not refer to the June 20 Presentation as involving negotiation materials, but instead as involving valuations that formed the basis for the Special Committee's rejection of the $14.25 offer.

In any event, the June 20 Presentation contained valuation information that arguably supported a fair value for Chaparral shares that exceeded TXI's $14.25 offer by several dollars per share. For example, the June 20 Presentation included:

- A valuation analysis comparing Chaparral to selected public companies, which implied a value of $24.47 per share based on the medians of the comparable companies.
- A matrix valuing Chaparral on multiples of its last twelve-month Earnings Before Interest Taxes Depreciation and Amortization ("LTM EBITDA"), which had a mid-range of $16.34 to $23.59 per share.
- A DCF valuation with a mid-point of $18.43 per share.
- A valuation analysis comparing premiums paid in other going private transactions. Based on a weighted average of premiums at periods one day, one week, and one month before deal announcement, the implied value of Chaparral shares was $16.41 a piece.
- An adjusted book value, which assumed that from 75% to 100% of accumulated depreciation would be added back. This valuation produced a range of $17.57 to $20.28 a share.
- A valuation analysis based on annual tons of steel capacity, which resulted in a value of $15.25 per share.
- A valuation based on the four most likely Management Scenarios. When each scenario was weighted equally, the resulting value was $14.84. But the value for Case One, which Chaparral management believed most likely, was $17.44 per share.[12] In addition, a version of the document produced from the files of the Special Committee indicates that by the time of the June 20 meeting, the weighted average was "really now $16."[13]

---

12. PX 12, at SC1217.

13. PX 41, at SC0287.

As I proceed to briefly describe the Special Committee's actions on June 20, it is as good a time as any to identify a problem that pervades the record. The depositions in this case were taken in the summer of 2000, some three years after the events in question. The Special Committee Chairman Belk was by then in his early eighties. The torpidity of the litigation pace is largely the fault of Clements and her counsel, who filed suit late on May 27, 1997, on the heels of TXI's original offer. Clements received documents two months before the merger closed on December 31 1997, but chose not to seek expedited deposition discovery or a preliminary injunction hearing. Not until April, 1999 did Clements amend her original complaint to attack the merger.

Regardless of the reason, the deposition testimony given by Belk and Clariond tended to generate, rather than dispell, litigable issues. Belk evinced little to no understanding or recollection of the financial information presented to the Special Committee by Robinson–Humphrey. As will be discussed later, Belk also gave testimony that seemed to reflect a misunderstanding on his part of the proper role of the Special Committee, testimony that suggested that Belk felt his job was to be fair to both TXI and Chaparral and to strike a deal at the highest price TXI would offer. Clariond's testimony was sharper on financial issues, but he had little recollection of Robinson–Humphrey's work. Indicative of both their testimony is that neither could remember the name of Kenan. This might seem a trifle, except for the fact that Kenan led the negotiating charge for the Special Committee, with precious little (remembered) involvement by the Special Committee members themselves. Belk's shaky testimony is rendered even more important because he was the key link to Robinson–Humphrey, with Clariond's only participation consisting of his attendance at meetings. Taken together, the deposition testimony is disquieting and engenders an overall feeling of discomfort. It may well be that the deposition testimony simply results from memories still rusty from disuse and that the reality is more sanguine, but at this procedural stage, that possibility is of little utility to the defendants.[14] With those thoughts in mind, I return to the chronology of events leading to the merger.

At the June 20 meeting, the Special Committee resolved to reject the $14.25 offer, based on Robinson–Humphrey's advice. This decision was at odds with Clariond's first instinct, which was to embrace the offer as a fair and attractive one. In Clariond's view, the offer was favorable because it reflected the price Chaparral would fetch in a prospering steel market. Clariond believed that the market was near its peak and that it would be unfortunate if the minority lost an opportunity to cash out at a favorable time. Nonetheless, Clariond supported the idea of negotiating with TXI for a better price, but with an approach that would not drive TXI away. In order to increase their leverage, the Special Committee decided that it would not issue its final report to the Chaparral board until Chaparral issued its quarterly earnings, which were expected to be impressive.

After the meeting, the Special Committee informed TXI that it would not approve the $14.25 offer. Robinson–Hum-

---

14. Put more bluntly, there is record evidence that suggests that when all is said and done, the Special Committee and its advisors will be found to have acted vigorously, informedly, and effectively, and that the merger negotiation and approval process unfolded as described in the Proxy Statement. The record, however, also contains evidence supporting a contrary inference.

phrey commenced negotiations with Dillon Read over price, with Robinson–Humphrey looking for a bid in the high teens. The bankers discussed valuation methodologies, the realism of various assumptions, and other factors bearing on price. Dillon Read considered Robinson–Humphrey's valuations based on the June 20 Presentation to be unrealistic, especially given the uncertainties attendant to the Chaparral East project.

On July 16, the Chaparral board met. By this time, the bankers had not reached an accord. The Special Committee reported its conclusion that the $14.25 offer was inadequate, and Robinson–Humphrey's June 20 Presentation was summarized. Meeting notes taken by Fowler indicate that Robinson–Humphrey had "determined that $16/share is a fair price."[15] Fowler's notes are consistent with the recollection of defendant Forward.[16] The same day, Chaparral issued a press release disclosing its quarterly earnings, but did not report that the Special Committee had rejected TXI's $14.25 offer.

After the meeting, negotiations between Robinson–Humphrey and Dillon Read continued. Robinson–Humphrey attempted to get TXI to offer a price higher than $16, but TXI was unyielding. On July 22, 1997, Robinson–Humphrey informed Dillon Read that the Special Committee was "still thinking high $16," but that it "can sell them on 16."[17] By July 23, 1997, Robinson–Humphrey was prepared to "go along" with an offer at $16 per share, but was told by Dillon Read that TXI would

not go that high.[18] Defendant Rogers suggested that Dillon Read attempt to get Robinson–Humphrey to split the difference between TXI's opening bid of $14.25 and $16.00, which would have resulted in a price of $15.125 per share.[19]

Another document in the record suggests that the banal approach of splitting the difference came from Robinson–Humphrey. A Dillon Read document containing proposed edits for the Proxy Statement included the following proposed rider:

> Robinson–Humphrey indicated that $16.00 per share was the lowest price that they would be prepared to recommend to the Special Committee, and SBC Warburg Dillon Read replied by noting that it did not believe that TXI would be prepared to pay more than $15.00 per share. After further discussion, Robinson–Humphrey suggested splitting the difference, and Dillon Read agreed to take that price of $15.50 per share to TXI.[20]

While the source of the difference-splitting approach is contested, what happened is not. Dillon Read and Robinson–Humphrey fixed on $15.50 as a price after Dillon Read said it thought it could get TXI to pay $15. Although Robinson–Humphrey did not have authority from the Special Committee to accept that price, on July 24, 1997 Robinson–Humphrey agreed to recommend that price to the Special Committee if TXI would offer it. On a more contested point, there is also evi-

15. PX 63.

16. Forward Dep. 131–32.

17. PX 66.

18. PX 30. This is based on a memorandum written by Dick Fowler reporting what Fowler had heard from Dillon Read about what

Dillon Read had heard from Robinson–Humphrey. Given the known identities of the authors, it should be possible to establish a foundation for the admissibility of this alleged admission of a party opponent.

19. *Id.*

20. PX 134.

dence that Robinson–Humphrey signaled that it could give a fairness opinion at $15.50 and that the Special Committee would accept that price.[21] Based on those signals, TXI indicated that it would offer $15.50. The next day, July 25, 1997, the TXI board formally endorsed the $15.50 price and made its new, higher offer public.

On July 29, 1997, the Special Committee met to consider the $15.50 offer. In advance of the meeting, Robinson–Humphrey prepared a new presentation (the "July 29 Presentation"), which built on its previous June 20 Presentation. According to defendants, the July 29 Presentation was the first valuation that Robinson–Humphrey performed that was designed to form the basis for a reliable valuation determination. In several material respects, the July 29 Presentation differed from the June 20 Presentation. For example:

- The July 29 Presentation used a more pessimistic multiple for its DCF valuation, reducing the resulting value from $18.43 per share to $14.98.[22]
- The July 29 Presentation omitted a purchase price comparison based on multiples of LTM EBITDA. The earlier June 20 Presentation comparison showed a range of values from $16.34 to $23.59 per share.
- The July 29 Presentation used "medians" rather than "averages" to indicate a value based on a comparable premiums analysis, yielding a weighted average of $15.60 rather than the $16.41 in the June 20 Presentation.
- The July 29 Presentation included a book value analysis in which only 50%

to 75% of depreciation was added back rather than the 75% to 100% in the June 20 Presentation. This lowered the range from $17.57 to $20.28 to $14.86 to $17.57.[23]

The deposition testimony regarding the July 29 Special Committee meeting is, at best, sketchy. Neither Belk nor Clariond could recall having considered Robinson–Humphrey's updated work in any detail, much less discussing the difference between the June 20 and July 29 Presentations. Clariond could not even recall if Robinson–Humphrey participated in the meeting, and did not discuss Robinson–Humphrey's analyses with Kenan. Belk's testimony about the meeting was impenetrably vague. When asked whether the Special Committee discussed Chaparral's projected earnings, Belk replied, "I think we were just interested in settling it, I don't recall." [24]

The Special Committee approved the $15.50 price that day. Belk testified that it was a good price, but also noted that the "main thing" was that TXI was "willing to give it." [25] The next day, the full Chaparral board met to consider the Special Committee's recommendation, and to receive Robinson–Humphrey's fairness opinion. A summary of the July 29 Presentation was given to the board, which did not contain the full set of analyses in the Presentation. For example, the summary omitted any DCF information and the valuations Robinson–Humphrey had prepared based on the Management Scenarios.[26] The summary also failed to present the ranges generated by the valuations it did present, and instead focussed the board on single numbers, almost all of which were under

**21.** PX 69, 71.

**22.** Compare PX 12 & 17.

**23.** *Id.*

**24.** Belk Dep. 195.

**25.** Belk Dep. 177–181.

**26.** PX 115.

$15.50 and which were more conservative than in the June 20 Presentation. After hearing from Robinson–Humphrey and the Special Committee, the board approved the transaction.

On November 28, 1997, Chaparral issued the Proxy Statement in connection with the merger. Neither Belk nor Clariond appears to have reviewed the Proxy Statement before it went out. The Proxy Statement was preceded by a new opinion by Robinson–Humphrey reaffirming its previous determination that the $15.50 price was fair.

Because TXI owned 84% of Chaparral's shares, the result of the vote was foreordained. The merger was approved overwhelmingly at a December 31, 997 meeting, with 92.9% of Chaparral's outstanding shares voted in favor of the merger. Only 0.4% voted against the transaction. Shareholders owning a total of 228,623 shares sought appraisal.

Plaintiff Clements did not bother to vote on the transaction. Nor did she seek appraisal. Despite having an active suit on file against the transaction, however, Clements tendered her shares into TXI's offer and received the merger consideration.

## II. *The Procession Of This Lawsuit*

As noted, this action was first filed by Clements on May 27, 1997, before the $15.50 price was even agreed upon. Clements' anxious and rapid start was not to persist.

In late October 1997, the defendants provided Clements with documents in response to her discovery requests. The information the defendants provided included the following:

- The June 20 and July 29 Presentations.[27]
- Robinson–Humphrey's engagement letter.[28]
- Hand-written notes suggesting that Robinson–Humphrey had agreed with TXI to issue a fairness opinion at $15.50 before the July 24 meeting.[29]
- Fowler's note regarding whether to provide the TXI board with a DCF valuation.[30]
- Drafts of early Robinson–Humphrey DCFs, and of management *pro formas* showing the impact of a merger at a price level of $20.[31]

Plaintiff Clements and her counsel reacted to the defendants' production with inaction. Clements did not seek deposition discovery. Clements did not seek a preliminary injunction proceeding. Clements did not amend her complaint. Instead, as noted, her next action was to tender her shares and accept $15.50 for each of her 106 shares. She then supposedly coordinated her discovery efforts with the petitioners in a separate appraisal proceeding brought in connection with the merger. The appraisal action resulted in a settlement.

On May 26, 1999, Clements filed her first amended complaint. In that complaint, Clements for the first time laid out her challenge to the $15.50 deal. Among the claims she made were the following:

- That the Proxy Statement was deficient because it did not describe the valuations contained in the June 20 Presentation, which Clements alleged

---

**27.** PX 12, 17.

**28.** *Baxley Aff. Ex. A.*

**29.** PX 69–71.

**30.** PX 46.

**31.** PX 20–22; PX 19.

was a "definitive" valuation presentation.[32]

- That the "much lower valuation analyses"[33] contained in the July 29 Presentation, which were summarized in the Proxy Statement, were based on "arbitrary" changes in assumption, which enabled Robinson–Humphrey "to obtain low enough valuations for Chaparral to give a favorable fairness opinion ..."[34]

- That the Proxy Statement did not disclose that most of Robinson–Humphrey's fee was payable only if it gave a favorable fairness opinion, and would not be payable if it gave an opinion that the transaction was unfair.[35]

Clements indicated that had she "and the Class received full and complete summaries of both the June 20 and July 29 Presentation Materials, as well as full disclosure of the compensation terms of Robinson–Humphrey's engagement, they would have been able to properly evaluate the validity and bona fides of the much lower valuation analyses ... in the July 29 Presentation Materials" and would have seen that those lower valuations resulted from arbitrary changes.[36]

After the amended complaint was filed, the parties engaged in additional fact discovery, which included depositions of the Special Committee members and relevant employees of Robinson–Humphrey. At the conclusion of this discovery, a second amended complaint was filed setting forth numerous disclosure claims. A number of those claims were closely related to the disclosure claims in the first amended complaint, but a number were wholly new.

The defendants then filed this motion for summary judgment, seeking dismissal of all of Clements' claims.

### III. *Procedural Standard*

On a motion for summary judgment, I must draw all reasonable factual inferences in favor of the non-moving party. If, after giving the non-moving party this benefit, the undisputed facts support a judgment in the moving party's favor, summary judgment is appropriate.[37]

### IV. *The Defendants' Primary Arguments Supporting Their Motion For Summary Judgment*

The defendants have centered their motion on two related assertions. Each is based on the claim that Clements acquiesced in the merger by tendering her shares in exchange for the merger consideration. The first of these arguments hinges on the defendants' assertion that each of the disclosure claims raised by Clements should be dismissed. To the extent that the defendants prove that Clements' disclosure claims are fatally flawed, the defendants will, they say, have shown that Clements' decision to accept the merger consideration was fully informed. As such, she would be disabled from challenging the fairness of the merger under the teaching of *Bershad*, which states that "an informed minority shareholder ... who ... accepts the benefits of [a merger] transaction cannot thereafter attack the fairness of the merger price."[38]

---

**32.** First Am. Comp. ¶ 25.

**33.** *Id.*

**34.** *Id.* ¶ 35.

**35.** *Id.* ¶ 30.

**36.** *Id.* ¶ 35.

**37.** *Burkhart v. Davies,* Del.Supr., 602 A.2d 56, 58–59 (1991).

**38.** Del.Supr., 535 A.2d 840, 842 (1987).

The second argument is a variant of the first, and turns on facts quite specific to Clements. Because Clements had challenged the fairness of the merger before its consummation, had received pre-consummation discovery that supported several of her eventual disclosure claims, never sought a preliminary injunction to stop the merger vote so that supplemental and corrective disclosures could be made, and then accepted the benefits of the merger, the defendants contend that Clements should be deemed to have acquiesced in the merger. Clearly, they argue, Clements believed that the merger was unfair, had much of the information she now relies upon for all of her claims, and made an opportunistic decision to both take the merger consideration and prospect for more. By so doing, Clements arguably avoided taking the most useful path for her fellow stockholders: using the discovery she received to shape a motion for expedited discovery and a preliminary injunction that could have resulted in an injunction requiring full disclosure of the material facts to the stockholders before their decision on the merger. This would have enabled stockholders to make a fully informed decision whether to accept the deal or seek appraisal, and have avoided the need for a speculative after-the-fact damages case.

I turn to the defendants' second argument now.

## V. *Is Clements Barred From Pressing Disclosure Claims Because She Received Pre–Merger Discovery And Then Chose To Accept The Merger Consideration?*

■ For the purpose of analyzing defendants' argument, I assume that Clements was provided with documentary discovery before the merger vote that led her and her counsel to believe that the merger was unfair and that the Proxy Statement did not set forth all the material facts relevant to Chaparral stockholders. This assumption is abundantly supported by the record. At the same time, however, I assume (as will be shown later) that Clements did not possess all the material facts regarding the merger before the merger vote and her decision to tender.[39] That is, I assume she had sufficient information to decide the merger was unfair, but lacked additional facts that bore on that question.

■ Equally clear is that Clements and her counsel made a tactical decision not to seek additional expedited discovery and a preliminary injunction hearing, preferring instead to pursue a case for damages. By this choice, Clements and her counsel consciously eschewed the course of action that would have most directly and effectively vindicated the Delaware law right of Chaparral stockholders implicated by the disclosures in the Proxy Statement: the right to receive all the material facts bearing on their vote from the Chaparral directors. The Delaware fiduciary duty of disclosure is not a full-blown disclosure regime like the one that exists under federal law; it is an instrumental duty of fiduciaries that serves the ultimate goal of informed stockholder decision making. The purpose of this area of disclosure law regulated by concepts of fiduciary duty is but imprecisely vindicated by *post hoc* damages actions, which are a poor substitute for prompt, pre-decisional corrective disclosures. Not only that, damages can be awarded without any showing of *scienter*, thus exposing defendants to an arguably harsh sanction, especially when the plaintiff possessed in-

---

**39.** Before she tendered, Clements did not possess information regarding the claims ad- dressed at § VI., A. and § VI., E, *infra.*

formation adequate to put the defendants on notice of possible deficiencies in time to correct them and avoid later damages liability.

Here, the defendants seek to use the doctrine of acquiescence as a basis for creating a salutory incentive for the plaintiff to seek corrective disclosures before a stockholder plebiscite. By denying a plaintiff who possessed evidence of a disclosure violation from accepting the merger consideration unless she first attempted to obtain corrective disclosures, the defendants argue that prospective class plaintiffs will be given a useful incentive to behave in the manner most consistent with Delaware public policy.

There is substantial appeal to defendants' arguments. But the arguments they make have been rejected by this court on two occasions after the decision in *Bershad*. In *Iseman*[40] the plaintiffs filed two complaints before a merger closed, including one alleging deficiencies in disclosure. They then tendered her shares and received the merger consideration. The court resolved the question as follows:

> Defendants argue that Iseman and Gruenberg had acquiesced by accepting the $37 per share merger consideration with knowledge of defendants' alleged unfair dealing and misleading statements. Defendants point out that Gruenberg believed the merger price was grossly inadequate from the outset and that plaintiffs must have been aware of the alleged misstatements in the Information Statement before tendering their shares since specific disclosure allegations were included in the Amended Complaint.

I find defendants' argument unpersuasive. Following *Bershad*, the question of acquiescence turns on whether plaintiffs were "informed" stockholders at the time they tendered their shares for the merger consideration. *From the allegations in the Amended Complaint, it appears that plaintiffs were not fully informed. They claim that the Information Statement contained material omissions and misrepresentations. The fact that plaintiffs were able to make such allegations does not mean that they had somehow learned **all** of the information that had been withheld from or misrepresented to the stockholders of Liquid Air. It only means that they had been able to piece together enough from what the Information Statement did and did not say to satisfy the standards of Chancery Court Rule 11 in making allegations upon information and belief.* Accordingly, I am not prepared to make a finding of acquiescence on this record either for purposes of denying class certification or granting defendants' motion for summary judgment.[41]

*Siegman*[42] involved a similar situation. In that case, the plaintiff had challenged a transaction on the ground that it violated 8 *Del. C.* § 203, lost a preliminary injunction motion, and then accepted the merger consideration. The defendants argued that the plaintiff had acquiesced in the transaction because he had read the transactional disclosure documents, found them misleading, and then accepted the consideration. Even though the plaintiff had clearly concluded that the defendants were not telling the full story, then Vice Chancellor Hartnett held that the plaintiff could press his claims because the defendants had not

---

**40.** Del. Ch., C.A. No. 9644, 1993 WL 40048, Berger, V.C. (Feb. 11, 1993).

**41.** *Id.* at *2.

**42.** Del. Ch., C.A. No. 11152, 1993 WL 10969, Hartnett, V.C. (Jan. 15, 1993).

shown that the plaintiff was aware of "all the facts." [43]

*Iseman* and *Siegman* have remained undisturbed since early 1993. They form an important part of the backdrop against which Clements and her counsel made their tactical decisions. Under their teaching, Clements could accept the transactional consideration so long as the defendants fail to show that she was aware of *all* the material facts, not simply that she was aware of some of the material facts that buttress her claims.

*Iseman* and *Siegman* also comport with the philosophy espoused in *Kahn v. Lynch Communication Systems, Inc.*[44] In that case, the Supreme Court held that a fully informed majority of the minority vote approving a squeeze-out merger proposed by a controlling stockholder only had the effect of shifting the burden of persuasion to a stockholder plaintiff challenging the transaction. The premise for giving this limited effect to the stockholder vote was that the potential threat of retribution from the controlling stockholder rendered the vote less than free. Given this premise, it would be somewhat paradoxical to hold that a stockholder who simply accepted the transactional consideration in a squeeze-out merger (as Clements did here) is barred from challenging that transaction solely because she had already concluded the transaction was unfair.

■ This is especially so in the case of a plaintiff, such as Clements, who forewent appraisal. Having abandoned the right to seek a fair value award that was not dependent on a showing of a breach of fiduciary duty, Clements became entitled to the merger consideration regardless of the outcome of this litigation.[45] Because of this factor, it is unclear exactly what policy purpose would be served by denying her the ability to proceed.[46]

---

**43.** *Id.* at *8.

**44.** Del.Supr., 638 A.2d 1110 (1994).

**45.** The only possible scenario where this is not so is in the event that a rescission order was entered. Clements did little to support her current litigation position by continuing to plead a rescission claim in her two complaints after she made a tactical decision not to seek to prevent the consummation of the merger. Clements' rescission claim is barred for the typical and obvious reasons, *see, e.g., In re Lukens, Inc. Shareholders Lit.*, Del. Ch., 757 A.2d 720, 727 (1999), *aff'd sub nom., Walker v. Lukens*, Del.Supr., 757 A.2d 1278 (2000). Clements' brief does not even attempt to defend the permissibility of this remedy, and thus I grant defendants' motion for summary judgment as to it.

**46.** Traditionally, the doctrine of acquiescence has included a showing that the plaintiff, by words or deed, has acknowledged the legitimacy of the defendants' conduct. *See, e.g., Frank v. Wilson & Co., Inc.*, Del. Ch., 9 A.2d 82, 87 (1939) ("In equity, in order for acquiescence to operate as a bar to a complainant's

action, knowledge of the act complained of is necessary, but when he freely does something which fairly and reasonably amounts to a recognition of the validity of that act, and which is inconsistent with its subsequent repudiation, a real conscious intent to approve or ratify it is not essential to that defense."), *aff'd*, Del.Supr., 32 A.2d 277 (1943). Here, the defendants were under no illusion that Clements was acknowledging the legitimacy of the merger, the approval of which was foreordained because of TXI's voting power. Pre-*Bershad* case law had taken a pragmatic view of the position of a plaintiff in Clements' place, and refused to place determinative weight on the mere acceptance of the consideration offered in a merger the plaintiffs could not stop at the ballot box. *See Kahn v. Household Acquisition Corp.*, Del. Ch., C.A. No. 6293, 1982 WL 8778, Brown, C. (Jan. 19, 1982); *Serlick v. Pennzoil Co.*, C.A. No. 5986, 1984 WL 8267, Walsh, V.C. (Nov. 27, 1984). The Supreme Court's opinions in *Bershad* and *Kahn v. Household Acquisition Corp.*, Del. Supr., 591 A.2d 166 (1991) have a somewhat different interpretive flavor, but do not grapple with the core question raised here. Indeed, *Kahn v. Household Acquisition Corp.*

Finally, I decline to extend the reasoning of *Andra v. Blount*[47] to the current context. In *Andra*, this court held that a plaintiff, Mary Andra, could not press disclosure claims in connection with an appraisal-eligible merger in a situation where the merger was certain to be approved because the majority stockholder controlled the outcome of the vote. The reason that Andra was barred was that Andra had in fact sought appraisal after having abandoned her misdisclosure-premised preliminary injunction motion.[48] Because the only consequential harm that could have flowed from a misdisclosure in connection with the squeeze-out merger was that a stockholder would not seek appraisal, Andra was clearly not injured by any misdisclosure. As a result, she was held to lack standing to press any disclosure claim. Nonetheless, Andra was permitted to press her attack on the fairness of the transaction.

In refusing to permit Andra to press her disclosure claims, the court noted that there might have been prudential reasons to allow her to proceed with her disclosure claims had she actually litigated them in a preliminary injunction proceeding before the merger vote. In that circumstance, Andra would have served the interests of other stockholders by seeking to ensure that they would receive complete and reliable decision-making information. But having abandoned the court-provided opportunity to litigate her preliminary injunction motion and having sought appraisal, Andra could not call on any public policy exception to the traditional standing requirement that a plaintiff have suffered injury from the actions of which she complains.[49]

There is unquestionably tension between the reasoning of *Andra v. Blount*, and the teaching of *Iseman* and *Siegman*. Nonetheless, *Andra* was not an acquiescence case, and it is difficult to reconcile the defendants' current position with cases like *Kahn v. Lynch*. While there may well be other judicial tools that can be used to create incentives for potential class plaintiffs to litigate disclosure claims more promptly and thus more usefully, the defendants have not persuaded me that the doctrine of acquiescence is one of them in the particular circumstances of this case.

## VI. Are The Defendants Entitled To Summary Judgment On Clements' Disclosure Claims?

Clements' second amended complaint alleges that the Proxy Statement contained numerous material misstatements and omissions of fact. Although that complaint contains a bewildering array of disclosure claims, Clements made a tactical decision to only preserve certain of those claims in response to the defendants' motion for summary judgment. Thus, this opinion

---

emphasizes the need to apply the acquiescence doctrine carefully, so that stockholders who relied on the state of the law at the time in accepting merger consideration are not held to have given up their right to seek a damages award. 591 A.2d at 177–178.

At bottom, the application of the acquiescence doctrine in this context turns on public policy considerations regarding the role that equitable, institutional actions play in the Delaware corporate law system. The pragmatic approach of *Iseman* and *Siegman* is consistent with the basic policy choice made in cases like *Cede & Co. v. Technicolor, Inc.*, Del.Supr.,

634 A.2d 345 (1993) and *Rabkin v. Philip A. Hunt Chemical Corp.*, Del.Supr., 498 A.2d 1099 (1985), which give greater weight to the protective benefits of representative, fiduciary duty actions than to the need to channel stockholder grievances into appraisal actions.

**47.** Del. Ch., 772 A.2d 183 (2000).

**48.** Andra later abandoned the appraisal route, but had not accepted the merger consideration.

**49.** *Andra*, 772 A.2d at 190.

addresses only those claims fairly raised by Clements' brief and treats all her other disclosure claims as waived.

Even with that narrowing of the issues in contention, there is some difficulty in clearly presenting Clements' disclosure claims, which tend to bleed into one another. Nonetheless, what follows is an attempt to describe and grapple fairly with each of her claims. In so doing, I will apply the settled principles of Delaware fiduciary duty law that govern disclosure claims. The most basic of these principles were well summarized by Chief Justice Veasey in *Loudon v. Archer–Daniels–Midland Co.*:

> It is well established that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action. An omitted fact is material if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote. To prevail on a claim of material omission, therefore, a plaintiff must demonstrate a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable stockholder. There must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable stockholder as having significantly altered the total mix of information made available.[50]

■■■ Delaware disclosure law also proscribes misleading partial disclosures.

When fiduciaries undertake to describe events, they must do so in a balanced and accurate fashion, which does not create a materially misleading impression.[51] Indeed, "the disclosure of even a non-material fact can, in some instances, trigger an obligation to disclose additional, otherwise non-material facts in order to prevent the initial disclosure from materially misleading the stockholders."[52]

**A.** *Is There A Triable Claim That The Proxy Statement Materially Misled Chaparral Stockholders Regarding The Reasons That The Special Committee Supported The Merger?*

■■■ The Proxy Statement includes a number of statements regarding the duties and process followed by a "knowledgeable" Special Committee.[53] Taken together, these statements assured Chaparral stockholders that the Special Committee's task was to represent solely the interests of the public stockholders, and that the Special Committee understood its duties because it received advice from independent legal counsel. Indeed, the Proxy Statement contained a specific statement regarding the Special Committee's belief that the merger was "procedurally fair" without a majority of the minority vote provision. The reason: the Special Committee was disinterested, well advised, and had bargained at arms-length.[54] Thus, the Chaparral public stockholders could take comfort, knowing that a Special Committee would not recommend the merger unless it was in their best interests and would have rejected the merger if it was not.

---

50. Del.Supr., 700 A.2d 135, 143 (1997) (citations omitted).

51. *E.g., Zirn v. VLI Corp.,* Del.Supr., 681 A.2d 1050, 1056 (1996); *Frank v. Arnelle,* Del. Ch., C.A. No. 15642, 1998 WL 668649, at *5, Chandler, C. (Sept. 16, 1998).

52. *Zirn,* 681 A.2d at 1056 (*citing Arnold v. Society for Savings Bancorp., Inc.,* Del.Supr. 650 A.2d 1270, 1280 (1994)).

53. DX 5, at 17.

54. DX 5, at 19.

Clements contends that the picture that was painted obscured the reality of the Special Committee's understanding of its role. According to Clements, the Special Committee felt that its job was simply to exact the best offer it could get from TXI, and accept what it could get, knowing that TXI had no intention to sell its majority block. Therefore, the Special Committee never considered the option of refusing a merger with TXI until TXI paid a truly fair price.

Ordinarily, this would be thin gruel to sustain a disclosure claim. Here, however, the record contains deposition testimony from Belk, which suggests that he understood his role as coming up with a price that was "fair to both sides" of the negotiation.[55] While the defendants claim that these statements were wrenched out of context, they were repeated by Belk more than once. When asked directly whether he thought it was his duty to be fair to both sides, Belk replied "sure." [56] Belk's testimony also suggests that he approved the $15.50 price because that was the most that TXI was willing to offer, rather than because it was a fair price. Although there are other elements of his deposition testimony that indicates that Belk felt the price was a good one, his most spontaneous responses focused on the fact that TXI was willing to do a deal at that price and not at a higher price.[57]

This testimony must be considered in concert with Clariond's testimony that he was initially prepared to accept TXI's original $14.25 offer at a time when the stock market price had jumped to $15.00. While Clariond's view that $14.25 was a fair and attractive price that the Committee should immediately embrace might have been a sincere one, that view combines with Belk's testimony to suggest that the Special Committee process was less pristine than the Proxy Statement recounted.

If the reality was that Belk did not (i) realize that he should not approve a deal that did not reflect fair value even if it was the best deal he could extract from TXI; (ii) recognize that the Special Committee's leverage consisted largely in its ability to say no, and (iii) understand that that fairness to TXI was not an issue that should concern him, these facts would combine with Clariond's pre-existing view of value to create a scenario in which the Special Committee's effectiveness was arguably compromised from the get-go. Because Clariond believed it wrong to allow the $14.25 offer to escape, he could hardly act as the impetus for the Special Committee to bargain aggressively. And if Belk misunderstood his obligations, then he could not either.

It may well be that the Proxy Statement is not misleading at all. Had Belk said something like the following it would be hard for Clements to defend this motion: "I approved the merger because the price was a fair one. We bargained as hard as we could to get the price up to $16.00, but TXI would not budge further. Because TXI was the only possible bidder and because the $15.50 price was a fair and attractive one for the public shares, we decided to support it once we had satisfied ourselves that TXI would not go any further. The reality was that unless TXI would offer the price, the price was not available to the public stockholders. Although we had made clear that we would reject a price lower than $15.50 and had tried to get a price better than that, the reality was that $15.50 was a very good deal and we took it." That testimony

---

55. Belk Dep. 177, 182.

56. *Id.* at 182.

57. *E.g., id.*

would have been consistent with the Proxy Statement's indication that the $15.50 price was the highest price TXI would offer, and that TXI had made its intentions not to sell its Chaparral stake plain.

What is not consistent with the Proxy Statement's statements (i) that the Special Committee was solely concerned with the public stockholders' welfare and (ii) that the Special Committee's recommendation was based solely on what was in the best interests of the public stockholders, is a belief on Belk's part that the Special Committee had to be fair to TXI and had to accept whatever the highest offer was that TXI was willing to make.[58] Because the evidence supports the inference that Belk misunderstood his duties in this respect, summary judgment is denied as to this issue.[59] Likewise, in the event that Belk misunderstood his duties, Clariond's initial view that the $14.25 offer should be accepted at a time when the stock market price of Chaparral shares had reached $15.00 might also have been material, too, since that view combines with Belk's possible misunderstanding to paint a picture of the Special Committee that is quite different than the one in the Proxy Statement.

■ In a transaction where the outcome is foreordained by the majority stockholder's voting power and where that voting power precludes the Special Committee from finding other purchasers, the effective functioning of the Special Committee as an informed and aggressive negotiating force is of obvious importance to the public stockholders.[60] When a Proxy Statement

---

58. It appears from the record that neither the Special Committee nor Robinson–Humphrey identified a range of fair values for Chaparral before entering price negotiations or accepting the $15.50. This decision contributes to my decision to deny summary judgment, because it combines with other factors to create a risk of dangers well-articulated in a previous case with analogous facts:

> Dillon Read never brought its various analyses down to a single range of values for TWA shares. Rather, it did a series of analyses employing · different valuation methodologies, each of which generated a possible range of values. These ranges of value themselves were wide-ranging. Then, when faced with the Icahn $20 cash/$30 principal amount of debt offer, Dillon Read expressed its view that, in its opinion, it was fair from a financial point of view to the minority. *Thus, the special committee was not apprised whether Dillon Read, had it forced itself through the analytical step between the analysis it did and the opinion it expressed, would have regarded the price offered as at the lowest edge of a broad range of arguably fair prices, or at some other position on such a scale. That information would be quite pertinent to a negotiator who understood that a "fair price" is always an arguable point on a range; who understood that, while a self-dealing fiduciary must offer a "fair" price, minority shareholders ...*

> *have no obligation to accept a price that falls within some range of fair prices; and, who sought not merely to bless a transaction that a banker was willing to call fair, but who sought to negotiate the highest possible price.* But the special committee in this case, appearing to reflect a complacency referable to an imperfect appreciation of the proper scope and purpose of such a special committee, did not ask its advisor to express a view about a range of fair value for TWA shares held by the minority shareholders.

See *In re Trans World Airlines, Inc. Shareholders Litig.*, Del. Ch., C.A. No. 9844, 1988 WL 111271, at \*5, Allen, C. (Oct. 21, 1988).

59. The record contains other evidence of Belk's confusion about the process. At his deposition, for example, Belk testified that he had been appointed by TXI. Belk Dep. 32.

60. See *In re Trans World Airlines* 1988 WL 111271, at \*12, stating:

> The final disclosure point that causes some concern under the appropriate legal test is whether there is a substantial likelihood that shareholders would have been misled by the proxy statement into believing that their interests were more fully protected by aggressive bargaining than in fact there were. No disclosure in a case such as this

details the functioning of that process, it must do so in a fair and balanced manner that does not create a materially misleading impression of how the Committee actually operated in fact.[61] The record reflects the triable possibility that the Proxy Statement at issue here did not meet this standard.[62]

### B. Did The Proxy Statements Set Forth All The Material Facts Regarding Robinson–Humphrey's Fairness Analysis?

■ The Proxy Statement indicates that the June 20 Presentation formed the basis for the Special Committee's rejection of the $14.25 offer. The Statement also refers to that Presentation as playing a role in the negotiation process, and the Special Committee's final decision to accept the $15.50 price.

The June 20 Presentation was significantly different than the July 29 Presentation. The latter, more pessimistic, Presentation is summarized in detail in the Proxy Statement. The June 20 Presentation is not. The valuations in the June 20 Presentation suggest that the $15.50 price might not have reflected the fair value of the minority shares.

Clements therefore argues that the Proxy Statement is materially misleading, because it fails to summarize the June 20 Presentation, and present any explanation for the large discrepancies between that Presentation and the later July 29 Presentation. The defendants retort that the reason the Proxy Statement did not do so is that the June 20 Presentation was simply designed as a negotiating tool, which also contained enough information to give the Special Committee a basis to reject TXI's opening offer.

The problem the defendants face is that they are moving for summary judgment. Their assertion that the June 20 Presentation was a mere negotiating tool may well emerge as convincing after a trial, but it is not backed up by unambiguous contemporaneous evidence sufficient to support the entry of summary judgment. The contrary inference that Clements suggests—which is that the Presentations changed in order to justify a bargaining outcome—is also a plausible one, given the record evidence. This record evidence includes total inability of either of the Special Committee members to provide any reasoned testimony about the nature and reasons for the large differences between the two Presen-

---

is presumably of greater importance to a shareholder than a disclosure that independent directors have actively negotiated on his behalf and have concluded, as here, that acceptance of the proposal is in his best interests. While corporate directors surely have no duty to adopt in corporate disclosure documents plaintiffs' characterizations or legal conclusions with respect to relevant facts, they do operate under a duty to assure all relevant facts are disclosed, including facts relating to their own actions and motives if they are truly relevant to the decision to be made.

**61.** *Matador Capital Management Corp. v. BRC Holdings, Inc.*, Del. Ch., 729 A.2d 280, 295 (1998); *Sonet v. Plum Creek Timber Co., L.P.*,

Del. Ch., C.A. No. 16931, 1999 WL 160174, at *8, Jacobs, V.C. (Mar. 18, 1999).

**62.** In the alternative, the record regarding the Special Committee process is so shaky that the defendants cannot use Clements' decision to tender as the basis for an acquiescence defense. Even if the record facts regarding the Special Committee process arguably fall within the self-flagellation doctrine, they go to the fundamental question of whether the Special Committee process functioned effectively and are relevant to whether the defendants have met their burden to prove their defense. *Brown v. Perrette*, Del. Ch., C.A. No. 13531, 1999 WL 342340, at *6, Chandler. C. (May 14, 1999) (*citing Stroud v. Grace*, 606 A.2d 75, 84 n. 1 (1992)).

tations.[63]

 To the extent that the June 20 Presentation was in fact designed as real valuation information, rather than as a purposely overly aggressive negotiating bid, the failure of the Proxy Statement to set forth its contents might constitute a material omission. Therefore, summary judgment as to this aspect of Clements' disclosure claim is denied.[64]

## C. Did The Proxy Statement Fairly Set Forth The Material Facts Regarding Robinson–Humphrey's Retention?

 Clements alleges that 80% of Robinson–Humphrey's $250,000 was contingent on its issuance of an opinion affirming—rather than rejecting—the fairness of a transaction. That is, Clements contends that Robinson–Humphrey would not get paid if it rendered a formal opinion to the Special Committee that an offer from TXI was unfair.

None of the parties who negotiated the retention letter understood its terms in this way. The retention letter is not reasonably read in the manner that Clements suggests, but is best read as entitling Robinson–Humphrey to its fee if it issued a formal fairness opinion, pro or con. The fact that the retention letter also required Robinson–Humphrey to update a positive fairness opinion does not avail Clements, because it is natural that such a clause

---

**63.** Clariond's lack of knowledge of Robinson–Humphrey's work is more important because he essentially acknowledged in deposition that Belk did not grasp the nuances of Robinson–Humphrey's work. Clariond Dep. 133.

**64.** I do grant summary judgment as to two other valuation-related disclosure claims. The first alleges that the Proxy Statement is materially misleading because it says that Robinson–Humphrey "assumed that the assumptions provided by management have been reasonably prepared and reflect the best currently available estimates and judgment of the Company's management." DX 5, at 22. Clements contends that this statement is false because Robinson–Humphrey applied professional judgment in using the Management Scenarios and other information it received from Chaparral, e.g., by giving equal weight to each of the Management Scenarios rather than giving more weight to Case One, which was management's best estimate. Clements' argument is quite strained. The obvious import of the sentence from the Proxy Statement is that Robinson–Humphrey was accepting management's bona fides in providing it information, not that Robinson–Humphrey would not apply its own professional judgment in reaching its value determination. That is, Robinson–Humphrey used management's assumptions as the raw material, which it would shape into a final fairness analysis using its own judgment. In this regard, it is worth noting that the Proxy State-

ment summarized the Management Scenarios and expressly warned readers that the inclusion of the Scenarios was not an indication of their predictive reliability. DX 5, at 21. Because I see no potential for material confusion here and because I do not believe that the Proxy Statement is actually false, I grant summary judgment as to this aspect of Clements' claim.

The other claim I grant summary judgment to is Clements' claim challenging the Proxy Statement's references to Robinson–Humphrey's November, 1997 "bring-down" opinion. This opinion reaffirmed Robinson–Humphrey's July 1997 determination that $15.50 per share was a fair price. Clements contends that the Proxy Statement leads the reader to believe that Robinson–Humphrey performed all of the same work it did in July 1997 over again in order to issue its bring-down opinion, when it in fact engaged in a much more summary exercise of reassessing its previous determination in light of developments between July and November 1997. This allegation does not raise a material disclosure problem. The evidence indicates that Robinson–Humphrey reviewed the new information that arose in the interim period, concluded that nothing had altered its view, and issued its bring-down opinion. This more summary exercise is what a reasonable reader of the Proxy Statement would have expected to have occurred, not a full-blown re-examination of fairness.

would exist as to a positive opinion, but not a negative one. Therefore, this aspect of Clements' disclosure claim lacks any evidentiary support and summary judgment is granted to the defendants on it.

▮ Likewise, I reject Clements' claim that the Proxy Statement is materially misleading regarding the reasons for Robinson–Humphrey's retention. The Proxy Statement says that Robinson–Humphrey was selected "because it is a nationally recognized investment banking firm that has substantial experience in transactions similar to the Merger." [65] Clements argues that this is at best a misleading partial disclosure, and that the Proxy Statement should have indicated that Robinson–Humphrey had never provided advice on a steel industry merger and was selected over large firms which had.

Clements' complaint does not raise a triable quibble. Robinson–Humphrey is "nationally recognized", i.e., it is known nationally. It does have substantial experience in transactions like the merger. Robinson–Humphrey had the institutional competence to represent the Special Committee well, and in fact employed an analyst who had a great deal of experience in following the steel industry. Whether Robinson–Humphrey in fact performed well on the Chaparral assignment is another matter, what is significant here is that the Proxy Statement did not portray the reasons for Robinson–Humphrey's retention in any materially misleading way.

▮ Clements' approach would turn proxy statements into vast compilations of information of little utility. The reason

why a competent banker was selected over other competent bankers will rarely be of material interest to investors, unless the reason suggests that the integrity of the Special Committee has been compromised by self-interest or a lack of independence. Here, there is no evidence that Robinson–Humphrey had any ties with TXI that would have led it to represent the Special Committee with less than appropriate rigor. As such, there was no reason for the Proxy Statement to contain a detailed recitation of the Special Committee's process for selecting Robinson–Humphrey.[66]

D. *Did The Proxy Statement Omit Material Valuation Materials Generated By Dillon Read And TXI?*

▮ Clements contends that the Proxy Statement was deficient because it failed to describe certain valuation exercises performed by Dillon Read and internal TXI management. In particular, Clements points to the DCF analyses that Dillon Read prepared based on the Management Scenarios, but which were not shown to the TXI board. Information of similar ilk prepared by TXI management is also in contention.

The Proxy Statement contained a summary of the presentation Dillon Read made to the TXI board in May of 1997, in advance of the board's decision to offer $14.25. The summary did not mention the Dillon Read DCF because that information was not presented to the TXI board. The only record evidence indicates that Dillon Read prepared the DCF, not as a reliable view of its own view of Chaparral's value, but as an exercise in preparing for future

---

65. DX 5, at 25.

66. Clements also argues that the Proxy Statement was false because it said that the Special Committee considered three candidates and because neither Belk nor Clariond could recall receiving a proposal from Salomon

Brothers, which was one of the three. This failure in memory three years after the fact does not involve an issue that is sufficiently important to be considered material under Delaware law.

negotiations. As important, the record evidence supports the defendants' contention that Dillon Read and TXI management did not view the analyses in question to be reliable indications of Chaparral's value, and indeed regarded them as quite speculative. There is no reliable evidence pointing in the other direction.

The record also indicates that Dillon Read was not retained to provide a fairness opinion to Chaparral, but simply to represent TXI. There is no evidence that suggests that Dillon Read or TXI management had information about Chaparral that was not also in the possession of Robinson–Humphrey and the Special Committee. Indeed, Robinson–Humphrey prepared its own DCF analyses using the Management Scenarios and other information used by Dillon Read. The Robinson–Humphrey analyses were the basis for the Chaparral Special Committee and board's decisions, and were therefore properly the major focus of the Proxy Statement.

As a result, I conclude that it would not have been material to a Chaparral stockholder to be informed of analyses by TXI's advisors that were not believed by those advisors to be reliable, and that were not presented to the TXI board, much less to the Chaparral board. Therefore, summary judgment on this issue is granted in favor of the defendants.

E. *Is The Proxy Statement Materially Misleading Because It Did Not Disclose That The Special Committee Had Earlier Concluded That $16 Was The Lowest Fair Price It Could Accept And Then Turned Around And Did A Deal At A Lower Price?*

██ Using a variety of record evidence, Clements argues that the Special Committee had set $16 as the floor price at which a deal could be done fairly. After having done so, Robinson–Humphrey's efforts to get TXI to offer $16 or more failed. Without having any basis in financial reason to conclude that a lower price of $15.50 was fair, Robinson–Humphrey supposedly agreed to recommend the price to the Special Committee if TXI would offer it and jerry-rigged its June 20 Presentation to justify that price as fair. It was able to get that price accepted because the Special Committee was so uninformed that it did not even question Robinson–Humphrey about the material differences between its June 20 Presentation and the July 29 Presentation, and because the Special Committee misunderstood its role. Rather than rejecting $15.50 as below its minimum fairness level, the Special Committee accepted it because that was all that TXI would offer.

The evil motive part of this argument was largely buttressed in the brief by Clements' assertion that Robinson–Humphrey's ability to get paid turned on its ability to deliver a positive fairness opinion. As noted, I have concluded that Robinson–Humphrey was not in fact motivated by such a concern, because its payment was not so conditioned.

Moreover, the claim that is made here essentially turns on whether the Special Committee and Robinson–Humphrey acted in bad faith or got caught up in the fervor of doing a deal. The former inference is not supportable in the record. Neither of the Special Committee members nor Robinson–Humphrey had any material interest in seeing a deal get done at a price that was unfair to the public stockholders of Chaparral. No whiff of bad faith emerges from the record, although hints of carelessness pervade the deposition testimony of the Special Committee members.

What is more plausible, however, is that the Special Committee and Robinson–Humphrey were not sufficiently cognizant of their ultimate weapon: the ability to

simply say no. It is possible that the Special Committee and Robinson–Humphrey originally believed that TXI should pay at least $16, but then realized that their only real method of providing liquidity to the public stockholders was to go along with a deal at $15.50. Once in the maelstrom of negotiations, it is not uncommon for parties to lose their head and for a consensual resolution of negotiations to become an end in itself. That is essentially what Clements argues happened here to a Special Committee that she contends was less than focussed and informed. Robinson–Humphrey, Clements contends, used the flexibility of the "science" of valuation to make the less than fair result the Special Committee obtained look acceptable.

Cutting against this is the evidence in the record that indicates that Robinson–Humphrey bargained hard with Dillon Read, and had signalled its willingness to recommend rejection of a deal at any price lower than the one eventually obtained. The record contains affidavits that explain in plausible fashion why it was reasonable for the negotiations to come out at the level they did and why Robinson–Humphrey's advice to accept $15.50 per share was sound.

That said, the record of the Special Committee's functioning that emerges from the depositions inspires so little confidence that a grant of summary judgment is unwarranted. It is possible that Clements will convince me at trial that the Special Committee and Robinson–Humphrey were so blinded to the possibility of walking away that they compromised their earlier judgment that $16 was the lowest fair price to justify their accession to TXI's stubborn refusal to raise its bid.

This assertion is not optimally addressed under the rubric of disclosure, however. At bottom, Clements argues that the Special Committee and Robinson–Humphrey did not understand nor fulfill their role on behalf of the public stockholders. To the extent this is proven at trial, that would tend to undermine the fairness of the merger. As a separate disclosure matter, this aspect of Clements' claim seems to fall within the self-flagellation doctrine, but prevents the defendants from prevailing on their acquiescence defense.[67]

To prevail on this claim, Clements must prove that the Special Committee and Robinson–Humphrey made a reasoned determination that $16 was in fact the lowest fair price, and then turned around and accepted $15.50 because that is all they could get out of TXI, using Robinson–Humphrey's analysis as cover for a poor negotiating result. It is only when proof of this sort is demonstrated that the Special Committee's focus on $16 becomes material. Because Clements' disclosure claim is essentially no different than her unfair dealing claim, this issue should be examined solely under the rubric of unfair dealing.[68]

At the same time, however, the defendants' argument that the disquieting aspects of the record regarding the Special Committee process are irrelevant misunderstands the basic premise of our law. The merger is a self-dealing transaction that, in the first instance, the defendants have the burden to show is fair. A fully functioning Special Committee at best shifts the burden of proving fairness to Clements.

The Proxy Statement never gives a hint that the Special Committee might have misunderstood its duties, and might not

---

**67.** *Brown v. Perrette*, Del. Ch., C.A. No. 13531, 1999 WL 342340, at *6, Chandler, C. (May 14, 1999).

**68.** *Id.* at *6–*7.

have understood or even identified the material differences in Robinson–Humphrey's June 20 and July 29 Presentations. Given that the defendants seek to preclude Clements from even presenting her unfair dealing claims on the basis of acquiescence, Clements is within her rights to point out that the Proxy Statement portrays the Special Committee's actions in a manner that might later be found to be materially different from how the Committee actually performed.

## VII. Does The Exculpatory Provision Of The Chaparral Certificate Of Incorporation Bar Any Of Clements' Claims?

 The defendants argue that all of the defendant-directors are insulated from liability by the exculpatory provision in Chaparral's certificate, which immunized them to the extent permitted by 8 Del. C. § 102(b)(7). As to the directors who are also officers, directors, and stockholders of TXI, I reject this defense. As traditionally conceived, the duty of loyalty is implicated when conflicted directors propose a self-dealing transaction. It is odd, I think, to posit that the TXI directors could have discharged their duty of loyalty if TXI is found, after trial, not to have paid a fair price. In an analogous context, Vice Chancellor Jacobs held that directors employed by a major stockholder were liable for rescissory damages because they approved corporate action that benefited their employer and the company's CEO to the detriment of the public stockholders.[69] Because the affiliated directors' action had the effect of unfairly injuring the public stockholders and aiding their employer, their actions were held to be a loyalty violation, regardless of the fact that they had not consciously intended to injure the public stockholders.[70]

 I conclude differently as to Belk and Clariond. Despite all the unsettling evidence in the record regarding the Special Committee process, there is no evidence that Belk or Clariond acted in bad faith or out of a conflicting self-interest. Any lack of effectiveness on their part emerges as a consequence of misunderstanding their duties or failing to apply adequate time and attention to the assignment given to them. That is, their conduct can at most be ascribed to a breach of the duty of care, and as such falls within the intended and permissible reach of Chaparral's exculpatory charter provision. Therefore, they are entitled to summary judgment in their favor. In so concluding, I specifically find that there is no record evidence that would support a conclusion that Belk and Clariond consciously approved a merger that they subjectively

---

**69.** *Strassburger v. Earley*, Del. Ch., 752 A.2d 557, 581 (2000). The defendants argue that the TXI directors cannot be held responsible for certain of Clements' disclosure claims, because the TXI directors would not have had access to the information that Clements contends should have been disclosed. There is some logical force to this argument, but I do not embrace it (at least, at this stage) for at least two reasons. First, this problem afflicts all disclosure claims, which are often based on information that only a subset of the board may have been aware of. Our law, however, seems to impose a board-wide duty on the directors to take steps to assure that all material facts are disclosed. More important, the

ultimate liability, if any, in this case will hinge on whether, at bottom, TXI treated the Chaparral public stockholders fairly. Any damage award will be tied to the difference between a fair price and what TXI in fact paid. That is, a damage award will result if this conflict transaction was effected at a price unduly favorable to TXI, a company in which the TXI directors held key positions and owned a considerable amount of stock. Their role in bringing about an unfair result implicates their duty of loyalty, not simply their duty of care.

**70.** *Id.*

believed was not in the best interests of Chaparral stockholders.

## VIII. *Conclusion*

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. The parties shall submit a conforming order, agreed as to form, within ten days.[71]

---

**71.** Given the outcome of this motion, plaintiff's motion for class certification is granted, and the parties shall submit a conforming order to that effect. Although I harbor serious concerns over the way this litigation proceeded in its early stages, I am persuaded that Clements and her counsel satisfy the relevant standards and will litigate the rest of this case with alacrity and appropriate zeal.